**NEW JERSEY TURNPIKE
AUTHORITY,
Plaintiff,**

**v.**

**PPG INDUSTRIES, INC.; Natural Products Refining Company; F.S.F. Company; Alliedsignal, Inc.; Mutual Chemical Company of America; Occidental Chemical Corporation; Maxus Energy Corporation; Occidental Petroleum Corporation; Oxy–Diamond Alkali Corporation; Chemical Land Holdings, Inc.; Martin Dennis Company; George M. Brewster & Sons, Inc.; Felhaber Corporation; Mohawk Constructors, II, Inc.; Reid Contracting Company, Inc.; Klevens Corporation; Horn Construction Company, Inc.; United States Fidelity & Guaranty Company; American Mutual Liability Insurance Company; John Doe Generators; John Doe Operators; John Doe Owners; John Doe Transporters; John Doe Affiliates; Defendants.**

Civil Action No. 93–2037.

United States District Court,
D. New Jersey.

May 15, 1998.

Schwartz, Tobia, Stanziale, Becker, Rosensweig & Sedita by Warren B. Kasdan, Roger C. Ward, Montclair, NJ, for Plaintiff.

St. John & Wayne by Joseph F. Lagrotteria, Newark, NJ, Sweeney, Metz, Fox, McGrann & Schermer by George E. McGrann, Pittsburgh, PA, for Defendant PPG Industries, Inc.

Lowenstein, Sandler, Kohl, Fisher & Boylan by David W. Field, Roseland, NJ, for Defendant AlliedSignal, Inc.

Drinker Biddle & Reath by William L. Warren, Lori A. Mills, Princeton, NJ, Andrews & Kurth by Thomas E. Starnes, Thomas R. Kline, Washington, D.C., for Defendants Occidental Chemical Corporation and Maxus Energy Corporation.

### OPINION

BISSELL, District Judge.

This matter comes before the Court on three separate motions: (1) Defendant AlliedSignal, Inc.'s ("Allied") motion for summary judgment (in which Defendant PPG Industries, Inc. ("PPG") joins); (2) Defendants Occidental Chemical Corporation's and Maxus Energy Corporation's (collectively, "Occidental")[1] motion for summary judg-

---

1. Occidental and Maxus are referred to in Allied's briefs collectively as "Diamond Shamrock," because the Diamond Shamrock Chemical Corporation was Occidental's predecessor, and a related entity of that corporation is Maxus. (See the corporate history of Diamond Shamrock, Occidental and Maxus, set forth in Occidental/Maxus' moving brief at 4–5). NJTA refers to them collectively as "Occidental/Maxus," asserting that the two companies are "united in interest." Occidental and Maxus have indicated that that is

not the case. Rather, they maintain that, beyond Maxus' status as an indemnitor of Occidental, Maxus' only other connection to this case is that it is the successor of a non-operating stock holding company of Diamond Shamrock that never exercised actual control over the plant operations at issue. Moreover, Maxus did not even exist until 1983, some twelve years after all generating operations ceased at the Diamond Shamrock facility.

ment; and (3) Plaintiff New Jersey Turnpike Authority's ("NJTA") cross-motion for partial summary judgment on the issue of liability against all of the Generator Defendants (Occidental, Allied and PPG). NJTA instituted this action on May 17, 1993 against the three Generator Defendants, asserting claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.;* the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10–23.11 *et seq.;* and the common law of the State of New Jersey.[2] Also included in the complaint was a claim for a declaratory judgment against the major defendants' insurance companies; however, summary judgment was granted in favor of the insurers in early 1996 and the declaratory judgment claim was dismissed from this action with prejudice. Certain other minor defendants were also named in the complaint. To date, none of the minor defendants have appeared in this action, with the exception of a non-generator defendant, Mohawk Constructors, Inc., in whose favor summary judgment was entered, without opposition from NJTA, on January 12, 1998.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

### STATEMENT OF THE CASE

The NJTA operates approximately one hundred eighty miles of highway, from the George Washington Bridge in northern New Jersey to the Delaware Memorial Bridge in the southwestern part of the State. In this action, it seeks to recover for the cost of investigating and remediating environmental contamination discovered at seven sites it currently owns or operates. The sites at issue are parcels of real property located primarily in Jersey City and Kearny, New Jersey. They are identified by the following New Jersey Department of Environmental Protection ("NJDEP") site numbers: 7, 20, 21, 56, 131, 192 and 201, and are described in greater detail by NJTA in its discovery responses. (*See* Field Cert., Exh. A at 5). All seven sites contain parts of the physical structure of the highway—piers, pilings and footings for elevated portions of the highway, work roads, access roads, etc.—which were built at different times from the early 1950's to the mid–1970's. (Doolan Cert. ¶ 2).

Each of the sites has been found to contain chromite ore processing residue ("COPR"), a substance designated as hazardous by the United States Environmental Protection Agency and NJDEP. COPR is a by-product of the refinement of chromium ore into metallic chromium components. (*Id.* ¶ 3). During the 1980's, the previously well-known toxic effects of chromium and chromium compounds became recognized as hazardous to the environment. Upon learning of the widespread use of COPR as landfill in Essex and Hudson Counties, NJDEP began investigating possible chromium contamination at numerous sites in that region of New Jersey.

NJTA alleges that at various times during the 1900's, the three Generator Defendants named in the complaint, Occidental, Allied and PPG (or the predecessor companies of these Defendants), owned or operated chemical companies in Hudson County that processed chromium ore. (Compl.¶¶ 47, 68, 96, 97). Defendant PPG allegedly acquired the Natural Products Refining Company, which processed chromium ore at a site in Jersey City from the 1950's until 1964. (*Id.* ¶¶ 54, 57, 68). Defendants Occidental and Maxus are allegedly responsible for the actions of Diamond Shamrock, which processed chromium ore at a facility in Kearny until the 1970's. (*Id.* ¶¶ 96–97). Defendant Allied is allegedly responsible as the successor of Mutual Chemical Corporation of America, which processed chromium ore at a site in Jersey City until the early 1950's. (*Id.* ¶ 47). The COPR produced at these three facilities was allegedly transported to other locations in New Jersey for use as fill material in various construction projects, including projects associated with the New Jersey Turnpike. (*Id.* ¶¶ 118, 120, 122). According to NJTA, the seven sites at issue in this litigation were among the properties that received COPR from the facilities of the alleged Generators. (*Id.* ¶¶ 119, 121, 123).

**2.** NJTA alleges the following common-law causes of action: strict liability, trespass, private nuisance, negligence, implied warranty and unjust enrichment.

In 1988, NJDEP issued a "Directive" that listed 118 chromium-contaminated sites, including four of the seven sites at issue in this lawsuit—Sites 7, 20, and 21 in Jersey City (where Allied's and PPG's plants were located) and Site 56 in Kearny (where Diamond Shamrock's plant was located). (*See* Starnes Cert., Exh. B). The 1988 Directive assigned the responsibility for the investigation and remediation of these four NJTA sites collectively to Allied, PPG and Occidental. (*Id.*, Attachment One). It acknowledged, however, that it "cannot identify which of the Respondent's chromite chemical production waste has been discharged and/or is being discharged" at those sites. (*Id.* ¶ 17).

In April 1990, Occidental entered into an Administrative Consent Order ("ACO") with NJDEP, voluntarily agreeing to investigate and remediate 26 chromium-contaminated sites in Kearny, including NJTA Sites 56 and 131. (Field Cert., Exh. E). Occidental agreed in the 1990 ACO to make monetary payments under the Spill Act, reimburse certain costs to NJDEP, and propose and implement interim and long-term remedial measures with respect to the Kearny sites. Occidental's execution of the 1990 ACO did not constitute an admission of any liability or fault, the agreement specifically stating that: "[a]lthough it agrees to pay this civil penalty, [Occidental] denies any violation of statute, rule, regulation or ordinance and payment of this penalty is without admission of fact, fault, liability or oblidation." (*Id.* ¶ 22). As well, the ACO states: "Neither the entry into this [ACO] nor the conduct of the Respondents hereunder, shall be construed as any admission of fact, fault or liability by the Respondents under any applicable laws or regulations." (*Id.* ¶ 109).

Since the entry of the 1990 ACO, Occidental has continued to assume responsibility for investigating and remediating chromium-contaminated sites in Kearny, including NJTA Sites 56 and 131. In addition, in March 1997, Occidental agreed with NJDEP to assume responsibility for a recently-designated NJTA site in Kearny—Site 201, "notwithstanding that the Department has been un-

able to identify the source of the COPR" located at that site and, again, without Occidental's admitting any legal liability for the contamination at that site. (Starnes Cert., Exh. C at 2). To date, Occidental has spent more than $700,000 implementing investigatory and remedial activities at the NJTA sites in Kearny alone and over $47 million at the many non-NJTA sites in Kearny that are also covered by the 1990 ACO.[3] (*Id.* at 18).

Three of the other four NJTA sites in question—Sites 7, 20, 21—are located in Jersey City, where Allied and PPG conducted their chromite ore processing operations, and Site 192 is located in Newark. Recall that the 1988 Directive assigned responsibility for the investigation and remediation of three of these four sites—Sites 7, 20, and 21—collectively to Occidental, Allied and PPG. None of the Generator Defendants, however, has assumed responsibility for the COPR deposited on those sites. Later, in May 1994, NJDEP issued a Directive assigning responsibility for Site 7 to Allied (Starnes Cert., Exh. G), but Allied and NJDEP have apparently been unable to agree upon a plan to remediate that site. Similarly, no one has agreed to investigate or remediate the COPR found at Sites 20, 21 or 192. (Field Cert., Exh. D at ¶ 8).

Occidental, Allied and PPG all agree on the central point of the motion filed by Allied and joined in by PPG—that NJTA cannot recover from any of the Generator Defendants in this action unless it establishes, at a minimum, that COPR generated by that specific defendant was deposited at one or more of the seven NJTA sites at issue in this litigation. This argument underlies the three Defendants' motions for summary judgment on all of NJTA's claims—its CERCLA and Spill Act claims as well as its state law claims. The motion submitted by Allied and PPG, however, distinguishes between the three Kearny sites and the other four sites insofar as Occidental is concerned, indicating that a slightly different analysis may be required regarding Occidental's liability for the Kearny sites. Occidental submits a separate memorandum of law to address this point and to emphasize that, in its view, the central

---

**3.** Sites 56, 131 and 201 are referred to throughout this Opinion as the "Kearny sites." The same sites are often referred to by Allied as the "Diamond Shamrock ACO sites."

principal underlying Allied's motion requires that summary judgment be entered against NJTA on all of the claims against Occidental as well, *including* those related to the three sites in Kearny that Occidental has agreed to investigate and remediate pursuant to the 1990 ACO with NJDEP. (*See* Field Cert., Exh. E). Allied and PPG argue in response to this that, although they do not seek to deflect any attention for the responsibility of these sites to Occidental (and agree that summary judgment should be awarded in favor of all of the Defendants on all seven sites), Occidental is not entitled to any contribution from either of them for the money it has spent investigating and remediating the Kearny sites.

## *ANALYSIS*
### I. SUMMARY JUDGMENT STANDARD

As previously stated, all three motions presently before the Court seek awards of summary judgment. Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying that standard:

> the judge must ask ... not whether ... the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive a motion for summary judgment, then, the nonmoving party must present "more than a mere scintilla of evidence" in its favor and "cannot

simply reallege factually unsupported allegations contained in [its] pleadings." *Id.* at 249, 325, 106 S.Ct. 2505; *see also Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 72 (3d Cir.1990). Only evidence that would be admissible at trial may be used to test a summary judgment motion. Evidence with a deficient foundation must be excluded from consideration. *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 466 (3d Cir.1989); *see also Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890–91 (3d Cir.1992).

It is clear that the Generator Defendants seek judgment in their favor on all of NJTA's claims—under CERCLA, the Spill Act and New Jersey common law. It is surprisingly unclear, however, whether NJTA crossmoves for summary judgment on all of its claims or just on its CERCLA and Spill Act claims. NJTA's brief in support of its crossmotion contains a "Scope Note," which notifies the reader that the arguments found therein serve a dual purpose: to respond to the motions of the Generator Defendants and to support its own cross-motion for summary judgment "as to liability." (*See* NJTA Cross–Motion Br. at 1). It is apparent from its arguments that NJTA moves for summary judgment on its CERCLA claim. Presumably, this is its intention with respect to its Spill Act claim as well. However, although NJTA also repeatedly states that it has made out a *"prima facie"* case for "common law liability," its arguments are not directed toward demonstrating an absence of a genuine issue of material fact with respect to any of its common law claims. These are discussed in greater detail in Section IV, below.

### II. CERCLA LIABILITY
#### A. *STATUTORY FRAMEWORK*

Congress enacted CERCLA, 42 U.S.C. § 9601 *et seq.* and, later, the Superfund Amendments and Reauthorization Act ("SARA"), 42 U.S.C. § 9613, in order "[t]o provide for liability, comprehensive cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites." *United States v. Rohm & Haas*

*Co.,* 939 F.Supp. 1142 (D.N.J.1996) (citing Pub.L. No. 96–510, Stat. 2767 (1980) (purpose clause)). CERCLA's statutory framework provides liability for any

(1) current owner or operator of a facility;

(2) person who owned or operated the facility at the time of the disposal of a hazardous substance;

(3) person who arranged for disposal or treatment, or arranged for transport for disposal or treatment, of hazardous substances at the facility; and

(4) person who accepts or accepted hazardous substances for transport to sites selected by such person.

*U.S. v. CDMG Realty Co.,* 96 F.3d 706, 713 (3d Cir.1996) (citing 42 U.S.C. § 9607(a)(1)-(4)). Section 107(a) of CERCLA renders all four of these classes of potentially responsible parties ("PRPs") liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian Tribe," as well as "any other necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a)(4)(A) and (B). Section 113 of SARA provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [section 107] ...." *Id.* at § 9613(f)(1).

■ An action under § 107 differs from an action under § 113 in one significant respect: a § 107 action can be brought only by innocent parties that have undertaken clean-ups. An action brought by a PRP, on the other hand, is by necessity a § 113 action for contribution. *See New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1120, *reh'g denied,* 116 F.3d 82 (3d Cir.1997). In essence, a § 107 "cost recovery" action imposes strict liability on PRPS for costs associated with waste cleanup and remediation and also imposes joint and several liability of PRPs. In contrast, a § 113 "contribution" action allows one PRP to recoup that portion of its expenditures which exceeds its fair share of overall liability. *Id.* at 1121–22. In order to establish CERCLA liability under either

§ 107 or § 113, a plaintiff must prove the following:

(1) that the defendant falls within one of four categories of "responsible parties;"

(2) that "hazardous substances"[4] were disposed of at a "facility;"[5]

(3) that there has been a "release"[6] or "threatened release" of hazardous substances from the facility into the environment; and

(4) that the release or threatened release has required or will require the plaintiff to incur "response costs."

42 U.S.C. § 9607(a); *CDMG Realty Co.,* 96 F.3d at 712.

In the instant case, NJTA seeks to hold the Generator Defendants liable as entities who "arranged for disposal" or "arranged for the transport" of a hazardous substance for disposal at each of the seven sites in question, *see* 42 U.S.C. § 9607(a)(3), under *both* § 107 and § 113 of CERCLA. In other words, NJTA is pursuing herein both a cost recovery claim as well as a contribution claim. For purposes of the instant motion, there is no dispute that COPR is a "hazardous substance" within the meaning of CERCLA, that the Generator Defendants (or their predecessors) were producers of COPR or that COPR was, in fact, discovered at each of the seven sites in question. A significant dispute exists, however, as to whether the COPR found at these seven sites can be linked to COPR produced by each of the Generator Defendants.

### B. *SECTION 107 CLAIM*

■ NJTA's attempt to proceed on its cost recovery claim under § 107 of CERCLA fails as a matter of law because NJTA itself is a PRP under the clear language of the statute. There is no dispute that NJTA is the current owner and operator of all seven sites in question. CERCLA's plain language clearly provides that current owner or operator of a facility is one of the four categories of PRPs liable for all costs of removal or remedial

---

**4.** *See* 42 U.S.C. § 9601(14).

**5.** *See* 42 U.S.C. § 9601(9).

**6.** *See* 42 U.S.C. § 9601(22).

action. 42 U.S.C. § 9607(a)(1). As a PRP, NJTA is limited to bringing a claim for contribution under § 113 and cannot as a matter of law maintain a cost recovery claim under § 107. Every court of appeals that has examined this issue agrees that a § 107 cost recovery action may be brought only by innocent parties that have undertaken cleanups. *See New Castle,* 111 F.3d at 1120 (citing cases). Here, NJTA is neither an innocent party nor a party that has undertaken clean up of any of the sites question. Accordingly, its claim under § 107 of CERCLA must be dismissed.

In a obvious attempt to avoid this inevitable result, NJTA advances the curious argument that, despite its status as the current owner and operator of all seven sites in question, it may nevertheless maintain a § 107 cost recovery action because, for recovery purposes, it qualifies as the State. NJTA does not, of course, explain how its alleged status as the State exonerates it from the liability clearly imposed upon it as a PRP under CERCLA. Rather, it merely discusses at length the reasons why it must be considered the equivalent to the State for purposes of recovery. The Court determines that the question of whether NJTA is the State is wholly irrelevant to this action, wherein there is no dispute that NJTA is the current owner or operator of the seven sites in question. The Court notes only that it seriously doubts that NJTA fails within CERCLA's definition of "state," [7] especially given that courts of this State have repeatedly recognized (although not in the CERCLA context) NJTA as analogous in many respects to a municipal corporation. *City of Newark v. New Jersey Turnpike Auth.,* 7 N.J. 377, 81 A.2d 705 (1951); *see also S.J. Groves & Sons Co. v. New Jersey Turnpike Auth.,* 268 F.Supp. 568 (D.N.J.1967) and *New Jersey Turnpike Auth. v. Parsons,* 3 N.J. 235, 69 A.2d 875 (1949).

For the foregoing reasons, the Court determines that NJTA's CERCLA claim is limited to a contribution action under § 113.

## C. *SECTION 113 CLAIM*

### 1. Lack Of Evidence That COPR Generated By Each Defendant Was Disposed Of At the Seven Sites In Question

In order to be able to proceed against each of the Generator Defendants on its contribution claim under § 113, NJTA must first establish that each Defendant has incurred § 107 liability. *See SC Holdings,* 935 F.Supp. at 1363. In other words, NJTA must show that each of the Defendants falls into one of the four PRP categories. NJTA argues that all three Defendants fall into the category of parties "who arranged for disposal" of hazardous waste. 42 U.S.C. § 9607(a)(3). There is no dispute that a critical issue with respect to the survival of NJTA's CERCLA claim against each Generator Defendant is whether NJTA has produced sufficient evidence that COPR generated by that defendant was, in fact, disposed of at one or more of the seven NJTA sites at issue in this litigation.

NJTA admits that it lacks direct evidence establishing that COPR generated by any of the Generator Defendants was deposited at any of the sites in question. In an effort to make up for its lack of proof, NJTA argues that the Court should apply the "alternative liability doctrine," pursuant to which the burden would shift to the Generator Defendants to prove that COPR originating from its plant was *not* the source of the COPR detected on each site in question. According to NJTA, if a Defendant cannot exclude itself as a possible source of the COPR in question, then not only should that Defendant's motion for summary judgment be denied, but NJTA's motion with respect to that Defendant should be granted. Additionally, with respect to the Kearny sites (#'s 56, 131 and 201), NJTA argues that, even if the Court

---

7. *See* 42 U.S.C. § 9607(27) (defining "state" to include "the several States of the United States, the district of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Marianas, and any other territory or possession over which the United States has jur-

isdiction"). *Compare id.* at § 9601(21) (defining "person" to include "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body").

declines to apply the alternative liability doctrine, it has, at the very least, presented enough indirect proof that COPR from the Diamond Shamrock plant contaminated the Kearny sites to defeat Occidental's motion for summary judgment.

### 2. Shifting the Burden of Proof of Causation: NJTA's Alternate Liability Theory

#### (a) CERCLA's Causation Requirement

■ At the outset of this analysis, the Court finds it important to briefly address CERCLA's causation requirement, as there appears to be some confusion about this issue in general. To avoid summary judgment in Defendants' favor on its CERCLA claims, NJTA contends that the statute does not require it to establish that each of the Generator Defendants' COPR caused damage to each of the seven sites in question. Such an argument misconstrues the causation requirement under CERCLA. While it is true that CERCLA does not require NJTA to establish a causal connection between each Defendant's hazardous waste and the corresponding response costs at a particular site, the statute does require NJTA to establish that the release or threatened release of each Defendant's waste caused the incurrence of response costs at that site. *Rohm & Haas Co.*, 939 F.Supp. at 1150.

■ Because such a significant portion of the instant motions is devoted to a discussion of the issue of causation under CERCLA, it is important to be clear about what is and what is not required to be proven under the statute. While it is not necessary for NJTA to link trace the cause of the response costs to each Generator Defendant, it is not enough that it simply prove that each Generator Defendant produced COPR and that COPR was found at each of the sites in question and ask the trier of fact to supply the link. Rather, in order to prevail, it must prove that each Generator Defendant deposited (or caused to be deposited) COPR at each of the sites in question. *See New Windsor v. Tesa Tuck, Inc.*, 935 F.Supp. 300 (S.D.N.Y.1996) (granting summary judgment to defendant in light of plaintiff's failure to demonstrate proof that defendant deposited

hazardous waste at the site in question); *Dana Corp. v. American Standard, Inc.*, 866 F.Supp. 1481, 1493 (N.D.Ind.1994) (recognizing that CERCLA requires a plaintiff to prove that each defendant's waste was disposed of at the site in question).

NJTA's characterization of *Dana*, 866 F.Supp. 1481, illuminates its misconception of CERCLA's causation requirement. NJTA contends that the holding in *Dana* indicates that it must prove *either* that each Generator Defendant produced a continuous and predictable waste stream *or* that a significant part of each Defendant's waste stream reached the site in question. In reality, the *Dana* court stated that a plaintiff must demonstrate *both* the generation of hazardous waste *and* disposal at the site in question, and if a plaintiff cannot make such a demonstration, then it must provide other evidence to justify the inference that the defendant's waste was deposited on the site:

> If the plaintiff demonstrates that the defendant produced a continuous and predictable waste stream that included hazardous constituents of the sort eventually found at the site, and that at least some significant part of that continuous and prediotable waste stream was disposed of at the site, the factfinder reasonably may infer that the defendant's hazardous waste was disposed of at the site. If the plaintiff cannot demonstrate such a continuous and predictable waste stream, or is unable to show that a significant part of defendant's waste stream reached the site, the plaintiff must present some further evidence to justify a reasonable fact finder in inferring that the defendant contributed to the hazardous waste at the site.

*Id.* at 1489.

The cases NJTA itself cites recognize the importance of the requirement that a plaintiff seeking to recover under CERCLA demonstrate a nexus between an off-site generator and the waste disposed of at a particular site. Indeed, the court in *United States v. Wade*, 577 F.Supp. 1326, 1331 (E.D.1983), drew the very distinction which NJTA now conflates. In reaching the determination that a plaintiff need not establish that a particular defendant's release resulted in the plaintiff's incur-

ring the clean-up costs at issue, the court stated that CERCLA nevertheless protected generators "by requiring a plaintiff to prove that a defendant's waste was disposed of at a site ...." *Id.; see also United States v. Alcan Aluminum Corp.*, 964 F.2d 252 (3d Cir.1992).[8] The precise question that must be addressed on the Generator Defendants' instant motions for summary judgment, then, is whether NJTA has produced sufficient evidence that COPR generated by that defendant was deposited at one or more of the seven NJTA sites at issue in this litigation.

### (b) Shifting the Burden of Proof

■ NJTA suggests that this Court shift the burden of proof of causation under CERCLA to the Generator Defendants. Despite the fact that NJTA cites absolutely no persuasive authority to support its attempt to invoke a rarely-used common law doctrine to a cause of action arising under a comprehensive and explicit Congressional statute, it suggests that, "[l]ike Al Jolsen's rainbow, the alternative liability procedure fits the Authority's record on these motions like a glove." (NJTA Br. on Cross–Motions at 29). It should go without saying that for the Court to apply such a doctrine in this case would be the exception rather than the rule.

Generally, a plaintiff bears the burden of proving the element of causation in the course of its effort to establish a prima facie case. In limited circumstances, exceptions to that rule have been carved out in order to remedy the difficulties encountered by plaintiffs in particular situations who would otherwise be unable to recover for negligently inflicted injuries. In the classic alternative liability case, *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948), two quail hunters had fired their guns in the direction of the plaintiff, who was severely injured by one of them, although he could not identify which one. Concluding that the negligence of both defendants had been established through proof that each one fired in plaintiff's direction, the

court then shifted the burden of proof to defendants on the causation issue for each to prove a negative—*i.e.,* that his shot was *not* the one that injured the plaintiff. The court reasoned that, because the two defendants were coequals from the standpoint of fault and because the plaintiff was without any evidentiary means whatsoever to prove from which hunter's shotgun the injuricus single pellet had been fired, without applying the burden-shifting framework, the tortfeasors would have escaped liability, leaving the injured plaintiff without the legal means to seek redress for his negligently inflicted injuries. *See Rutherford v. Owens–Illinois, Inc.,* 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203, 1215 (1997) (discussing the California Supreme Court's holding in *Summers*).

■ Under any burden-shifting framework, the plaintiff still bears the initial burden of demonstrating that the theory should be invoked. Thus, even in *Summers,* the court did not shift the burden on causation to the defendants until the plaintiff had already established that they had acted negligently— *i.e.,* that they had breached a duty of care owed to him when they pointed their guns in his direction and fired. In order for the alternative liability doctrine to apply, the plaintiff must initially prove that "the two or more actors joined as defendants acted 'tortiously'" towards the plaintiff and, furthermore, "all of culpable defendants [must] have been joined in the action." *See also McLaughlin v. Acme Pallet Co.,* 281 N.J.Super. 565, 569, 658 A.2d 1314 (App.Div.1995) (quoting *Restatement (Second) of Torts* § 433B(3), comments g and h, and *Shackil v. Lederle Laboratories,* 116 N.J. 155, 166, 561 A.2d 511 (1989)).

Putting to one side for the moment the issue of whether this doctrine, grounded in the common law of tort, has any application at all in the context of a cause of action under CERCLA, the Court determines that NJTA

---

8. It is important to stress that we are dealing with *offsite* generators here. NJTA fails to understand the importance of this fact. It places great emphasis on the holdings in *Alcan* and *Rohm and Haas* regarding causation under CERCLA (which the generator defendants do not disputer but ignores the fact that even those two

cases expressly state that a CERCLA plaintiff must demonstrate not just that the defendant is a generator of hazardous substances, but also that the defendant is a generator of hazardous substances *at the facility* in question). *See, e.g., Alcan,* 964 F.2d at 264.

has not sustained its initial burden of demonstrating that the alternative liability doctrine should be invoked. It has not demonstrated with competent evidence that any of the Generator Defendants acted negligently towards NJTA by transporting, depositing, or even directing the delivery of COPR onto any of the sites in question. As one of the Generator Defendants has argued to the Court, "under NJTA's theory, in *Summers*, any hunter who ever fired a shot—regardless of whether the shot was fired in the same woods and in the direction of plaintiff—would have been liable." (Def. Allied's Reply Br. at 12). This Court agrees that such a reading of the alternative liability doctrine is far too expansive.[9]

In addition to its failure to sustain the threshold requirements for invoking the alternative liability doctrine in this case, NJTA has failed to cite a single case under either CERCLA or the Spill Act that has ever applied the alternative liability doctrine or, for that matter, any other collectivist liability theory, such as "enterprise"[10] or "market share"[11] liability. Especially given the clear statutory requirements for establishing liability under CERCLA, NJTA has presented no precedent that suggests to this Court that a burden shifting framework should be employed in this case. Further, one of the primary justifications for invoking the alternative liability doctrine—to provide redress for injuries that would not be remedied otherwise—is plainly absent here. The alleged

damage here—the environmental harm—is already being addressed in ongoing NJDEP proceedings, which have already secured the agreement of Occidental to address three of the seven sites in question. As well, unlike in the traditional alternative liability scenario, the lack of proof of causation here is not due to the Defendants' conduct. In fact, NJTA is in a *better* position than the Defendants to ascertain the source of the COPR at each site, because NJTA is the present owner and operator of all seven sites and was the entity that contracted to receive the COPR that is the source of the contamination. *See Blanks v. Murphy*, 268 N.J.Super. 152, 162, 632 A.2d 1264 (App.Div.1993) (rejecting burden shifting because plaintiff was in a better position to determine the cause of its injury).

■ Additionally, as NJTA itself recognizes, the alternative liability doctrine applies only when the party seeking to invoke the doctrine is blameless. *See Shackil,* 116 N.J. at 165–66, 561 A.2d 511; *see also Restatement (Second) of Torts* § 433B(3), comment f. While it recognizes that it must be an innocent party in order for the doctrine to apply, NJTA completely overlooks the fact that it is jointly and severally liable for the contamination at the sites in question under § 107(a)(1) of CERCLA, as the present owner and operator of each of those sites. *See* 42 U.S.C. § 9607(a)(1); *see also New Castle,* 111 F.3d 1116. In addition, NJTA itself contracted to receive the COPR that ultimately contaminated the sites in question.

---

9. NJTA's attempt to rely on *Anderson v. Somberg*, 67 N.J. 291, 338 A.2d 1, *cert. denied*, 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975), for the proposition that the Generator Defendants bear the burden of exculpating themselves from responsibility for the disposal of the COPR at the sites in question is unavailing. According to NJTA, that decision requires that it only identify any manufacturer of chromium in order for the burden to shift. *Anderson* addressed a very narrow "exceptional" factual situation, wherein the court determined that the plaintiff was in a special (doctor-patient) relationship with the defendants who, as a result, owed plaintiff a special duty of care. *See also Shackil,* 116 N.J. at 173, 561 A.2d 511 (recognizing that Anderson was limited to a particular factual context); and *Straley v. United States*, 887 F.Supp. 728, 745 (same).

10. Enterprise (or "concert-of-action") liability has been applied to allocate responsibility among

parties who pursue a common plan or design to commit a tortious act. That theory is clearly inapplicable to the facts of the instant case. Here, NJTA does not contend, nor is there any evidence to show, that the Generator Defendants engaged in any sort of common plan to deposit COPR at the sites in question.

11. Market-share liability has been applied in situations where a plaintiff joins in one lawsuit a substantial share of the manufacturers who might have supplied a particular product that caused his harm. Any manufacturer which cannot exculpate itself by showing that it was not the manufacturer of the particular product that caused plaintiff's harm is liable for its percentage share of the market for that product. NJTA does not allege that market-share liability should be invoked in this case where, given the limited number of potentially responsible "manufacturers," that theory has no logical application.

Its involvement in this respect cannot be overlooked as, presumably, NJTA (or its employees) contracted to obtain the residue that possessed the right characteristics for NJTA's purposes (to be used in landfill or construction projects). Furthermore, NJTA's participation in this respect distinguishes this case from the only environmental case (although not a CERCLA or Spill Act case) to which NJTA cites in which the alternative liability doctrine was applied. In *Zands v. Nelson*, 797 F.Supp. 805, 808 (S.D.Cal.1992), the plaintiffs sought recovery of clean-up costs pursuant to the Resource Conservation and Recovery Act ("RCRA") for contamination discovered on their property that had been caused by gasoline tanks previously located thereupon. A series of persons or entities had owned the property prior to the plaintiffs, who could not demonstrate when the contamination occurred. *Id.* at 816. The court determined that the plaintiffs could invoke the alternative liability doctrine, but only if they first demonstrated their innocence by proving that the contamination existed before they acquired the property.[12] *Id.* at 817.

For all of the abovementioned reasons, the Court determines that it would be inappropriate to apply the doctrine of alternative liability to NJTA's CERCLA claims in the present case. Without the aid of the alternative liability doctrine, NJTA cannot maintain a claim under CERCLA against either Allied or PPG with respect to *any* of the sites at issue, because it can produce no competent evidence to show that COPR from either Allied's or PPG's facility was deposited on any of the sites at issue. The Court reaches the same conclusion with respect to Occidental, but only for Sites 7, 20, 21 and 192. With respect to these four sites, all three Generator Defendants stand in the same position, NJTA essentially agreeing with this Court's conclusion that it cannot maintain a CERCLA claim against any of them without the aid of a collectivist liability theory. (*See* NJTA Answering Br. at 9). With respect to Sites 56, 131 and 201 (the Kearny sites), however, NJTA argues that its CERCLA claim survives as against Occidental even without the aid of such a theory.

### 3. Indirect Evidence of Occidental's Liability for Sites 56, 131 and 201 (Kearny Sites)

■ NJTA maintains that its claims against Occidental regarding the Kearny sites can survive summary judgment regardless of whether the Court applies the doctrine of alternative liability, because the record contains strong inferential evidence that Occidental is responsible for the contamination of Sites 56, 131 and 201. This evidence can be summarized as follows: (a) the geographical proximity of the Kearny sites to the site of Diamond Shamrock's former chromite ore processing plant; (b) a statement made by NJDEP in the 1990 ACO in which Occidental agreed to investigate and remediate Sites 56 and 131; and (c) the subsequent agreement of Occidental to investigate and remediate Site 201 pursuant to the same terms outlined in the 1990 ACO. The Court determines that this evidence is insufficient to defeat Occidental's motion for summary judgment.

#### (a) Proximity of Diamond Shamrock's Former Plant

NJDEP has itself made clear that the proximity of the Kearny sites to Diamond Shamrock's former plant site is not an adequate basis for concluding that any COPR detected on the Kearny sites was produced by Diamond Shamrock, rather than by Allied and/or PPG at their plant sites in Jersey City. NJDEP clearly stated that it could not determine which of the three Generator's chrome waste was present on which of the Sites 7, 20, 21, *56* and *131* and that, with respect to these sites, "it could have been any one of [Allied, PPG or Occidental]." (*See* Corcory Cert., Exh. A ¶ 17). Similarly, as recently as 1996, NJDEP expressly stated that, despite the proximity of Site 201 to the site of the former Diamond Shamrock plant, it could not ascribe responsibility for Site 201 to Diamond Shamrock and, thus, it was

---

12. *Zands* is also distinguishable because in that action, all of the defendants were *on-site* generators of hazardous waste. Here, we are dealing with *off-site* generators whose very connection to the specific sites in question is precisely the issue.

placed into the NJDEP "orphan" site category. (Doolan Cert., Exh. C).

### (b) The 1990 ACO and Occidental's Conduct Thereunder

Nor does the 1990 ACO provide a basis on which to conclude that Diamond Shamrock was the source of the COPR on Sites 56 and 131. The clear words of the 1990 ACO itself preclude reliance upon the ACO as evidence of liability. The 1990 ACO specifically states that: "Although it agrees to pay this civil penalty, [Occidental] denies any violation of statute, rule, regulation or ordinance and payment of this penalty is without admission of fact, fault, liability or obligation." (Field Cert., Exh. E ¶ 22). As well, the ACO states: "Neither the entry into this [ACO] nor the conduct of the Respondents hereunder, shall be construed as any admission of fact, fault or liability by the Respondents under any applicable laws or regulations." (Id.¶ 109).

■ Several sources of law also preclude any reliance upon the 1990 ACO as evidence of liability in this case. Federal Rule of Evidence 408 provides that evidence of "furnishing or offering or promising to furnish ... a valuable consideration in compromising ... a claim which was disputed as to either validity or amount is not admissible to prove liability for ... the claim or its amount." Fed.R.Evid. 408. Courts agree that Rule 408 applies to civil consent decrees executed with government agencies. See, e.g., United States v. Austin, 54 F.3d 394, 399–400 (6th Cir.1995) (consent decree with Federal Trade Commission); Johnson v. Hugo's Skateway, 974 F.2d 1408, 1438 (4th Cir.1992) (consent decree with Department of Justice); United States v. Gilbert, 668 F.2d 94, 97 (2d Cir. 1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982) (consent decree with Securities and Exchange Commission). Here, there is no question that Occidental entered into the 1990 ACO with NJDEP in order to compromise a disputed claim; accordingly, Fed.R.Evid. 408 bars reliance upon it as evidence of liability.

The purpose of Rule 408 is, of course, to encourage settlements and compromises of disputed claims, which would be discouraged if such evidence were admissible. See Advisory Committee Notes (1974 Enactment) to Fed.R.Evid. 408. A similar policy has been incorporates into the two environmental statutes governing this case, which not only encourages compromise of disputed claims but, perhaps even more important to the purposes underlying those statutes, such a policy also encourages clean-up. See In re Reading Co., 115 F.3d 1111, 1119 (3d cir.1997). CERCLA states that "the participation by any party in the [consent decree] process under this section shall not be considered an admission of liability for any purpose, and the fact of such participation shall not be admissible in any judicial or administrative proceeding ...." 42 U.S.C. § 9622(d)(1)(B). Similarly, the Spill Act provides that "[n]o action taken by any person to contain or clean up and remove a discharge shall be construed as an admission of liability for said discharge." N.J.S.A. 58:10–23.11f.a.(3).

NJTA's argument that the Court should distinguish the words of the 1990 ACO from the actions taken by Occidental and Maxus pursuant to that agreement—because actions such as paying a fine and pursuing clean-up measures "provide a very powerful inference of consciousness of specific responsibility"—is wholly without merit. (See NJTA Mem. in Suppt. of Cross–Motion at 24). The above-quoted provisions of both the Spill Act and the 1990 ACO itself are directly contrary to NJTA's proposed distinction. See Spill Act, N.J.S.A. 58:10–23.11f.a(3) ("No action taken by any person to contain or clean up and remove a discharge shall be construed as an admission of liability for said discharge") (emphasis added); 1990 ACO ¶ 109 ("Neither the entry into this Administrative Consent Order nor the conduct of the Respondents hereunder, shall be construed as any admission of fact, fault or liability ....") (emphasis added). As well, Fed.R.Evid. 408 excluded not only the settlement offer or promise as evidence of liability, but also the furnishing of the consideration promised in the settlement offer. Fed.R.Evid. 408.

NJTA's argument that the rule excluding settlement agreements from consideration does not apply to "factual findings" contained within an administrative consent order is equally unavailing. NJTA seeks to rely on

NJDEP's statement in the 1990 ACO that Occidental "is responsible for the chromite ore processing residue, chromium and its compounds at [Sites 56 and 131]" (1990 ACO ¶ 16). A comparison of the 1990 ACO and 1988 and 1994 Directives indicates that the NJDEP's use of the term "responsibility" in the 1990 ACO was not intended to convey a finding of fact but, rather, was directed at Occidental alone because Occidental was the only one of the three alleged Generators that agreed to reach a settlement with NJDEP regarding the Kearny sites. Had there been no settlement agreement, there would have been no determination of "responsibility" directed at Occidental.

The 1988 Directive stated that all of the Respondents [Allied, PPG and Occidental] were "responsible" for the contamination at Sites 7, 20, 21 and 56 (Corcory Cert., Exh. A ¶ 20), and the 1994 Directive stated that all three of these Generator Defendants were "responsible" for the contamination at Sites 20 and 21. (Supp. Cert. of NJTA's Counsel, Exh. 67 ¶ 16). It appears that NJTA itself recognizes that the use of the term "responsible" in the 1988 and 1994 Directives does not preclude an award of summary judgment on the Jersey City sites against it, as it acknowledges that those claims can go to trial only if the Court invokes the alternative liability doctrine. (NJTA Answering Br. at 9). There is simply no basis for concluding that the use of the term "responsible" in the 1990 ACO regarding the Kearny sites was meant to be any different than the use of that term in the 1988 and 1994 Directives regarding the Jersey City sites. Further, NJDEP itself has recognized that a directive is simply a form of notice pleading. It has argued that directives do not possess independent legal force but, rather, serve only to provide notice to potentially responsible parties of their obligations under CERCLA or the Spill Act. *See In re Kimber Petroleum Corp.*, 110 N.J. 69, 77, 539 A.2d 1181 (1988).

The very terms of the 1990 ACO agreement support this conclusion. The 1990 ACO expressly states that it incorporates by reference the 1988 Directive insofar as that directive related to the Kearny sites at issue in the 1990 ACO. (*See* 1990 ACO ¶ 13). In-

cluded, then, are the provisions in the 1988 Directive which state that the NJDEP could not identify which of the Generator Defendants' COPR had been discharged and/or is discharging at the NJTA sites and that the source of the COPR could have been from any of the Defendant's facilities. (1988 Directive ¶ 17). Even without incorporating the terms of the 1988 Directive, however, it is clear that at the time of the 1990 ACO, NJDEP remained unable to distinguish between Diamond Shamrock's COPR and the COPR produced by Allied and PPG. Thus, even though neither Allied nor PPG was a party to the 1990 ACO, the NJDEP stated therein that the COPR at the Kearny sites was chemically and physically indistinguishable from the COPR generated by the chemical facilities of Diamond Shamrock, Allied and PPG. (1990 ACO ¶ 10). In other words, NJDEP still understood that any of the three Generator Defendants could have been responsible for the COPR covered by the 1990 agreement with Occidental.

### (c) Occidental's Agreement Regarding Site 201

At the time that it was executed, the 1990 ACO did not apply to Site 201, because that site was not designated as a chrome site until some six years later. Thus, NJTA's arguments concerning the alleged "factual findings" embodied in the 1990 ACO cannot be applied to Site 201. Furthermore, when it was designated as a contaminated site in 1996, NJDEP clearly stated that it would be treated as an "orphan" site, because the contamination found thereupon could not be traced to any previously identified site. (Doolan Cert. Exh. C). The only evidence to which NJTA can point regarding Occidental's alleged liability for the contamination of Sites 201, then, is that Occidental volunteered to investigate and remediate that site under the same terms set forth in the 1990 ACO. This argument is very similar to NJTA's contention that the actions Occidental has taken in furtherance of the 1990 ACO provide strong inferential evidence of its liability for the contamination of Sites 56 and 131. For the same reasons discussed above, the Court determines that NJTA's argument regarding

Occidental's assumption of the investigation and remediation of Site 201 lacks merit.

### (d) Remediation at Kearny is Underway

As a final matter on this topic, the Court notes that all three Generator Defendants have argued that fatal to NJTA's CERCLA claims against them is the fact that, apart from spending $40,000 to erect a fence around Site 20 in Jersey City, NJTA has failed to prove that it has incurred or will incur any expense to remediate any alleged environmental damage at any of the sites in question. NJTA argues that it need not present any evidence of damages at this point "since that factual topic is not before the court at this time." (NJTA Answering Br. at 8). There are at least two reasons why NJTA's failure to present evidence on this issue is relevant at this time. The first reason was addressed above in connection with NJTA's unsuccessful attempt to invoke the alternative liability doctrine, the Court concluding that that doctrine is designed to make available to a plaintiff who has been harmed a remedy for such harm that it would not realize if the doctrine were not applied. *See Rutherford v. Owens–Illinois, Inc.*, 16 Cal.4th 953, 67 Cal.Rptr.2d 16, 941 P.2d 1203, 1215 (1997). The second reason has to do with the remediation already underway at the Kearny sites. It is undisputed that Occidental and Maxus have agreed to investigate and remediate Sites 56, 131 and 201, and it is undisputed that they have already spent more than $700,000 for that purpose. There are no allegations that Occidental has not adequately and lawfully performed at those three sites. As a result, there has never been any reason for NJTA to incur any investigatory, remediation or legal expenses with respect to the Kearny sites.

### D. ALLIED/PPG's INVOLVEMENT IN THE KEARNY SITES

As the Court has already determined, NJTA's CERCLA claim cannot survive against Allied or PPG with respect to any of the seven sites at issue. There is a remaining issue to discuss regarding the Kearny sites—Occidental's crossclaim against Allied and PPG for its own investigation and remediation of the Kearny sites. Occidental showed no indication that it would seek contribution from Allied or PPG until NJTA filed the instant lawsuit against all three Generator Defendants. Given the Court's conclusion herein, that NJTA may not proceed on its CERCLA claim against any of the Defendants for any of the seven sites, there is some question as to whether Occidental will continue to pursue this crossclaim. Its briefs to this Court seem to indicate that it will not. It repeatedly argues that *if* NJTA's claims are allowed to proceed against Occidental for any of the sites at issue, then it must be allowed to seek contribution for PPG and Allied. (*See, e.g.,* Occidental's Mem. at 15, 16–17). Occidental does not argue, however, that it should be allowed to proceed against Allied and PPG even if NJTA's CERCLA claim against it is *not* allowed to go forward.

Allied and PPG nevertheless raise an important point. Unlike NJTA, which has not established that it has suffered any damages as a result of clean-up efforts, Occidental has established that it has expended $700,000 in connection with the investigation and remediation of the Kearny sites. Of course, Occidental bears the same burden of proof on its crossclaim that NJTA bears on the underlying CERCLA claim itself. Thus, Allied and PPG are correct in arguing that, in order to recover from them for any part of the cost expended to investigate and remediate the Kearny sites, Occidental must present evidence indicating that Allied's or PPG's chrome residue was deposited at each of the three sites in question. This it has not done. Accordingly, summary judgment on Occidental's crossclaim for contribution under CERCLA must be awarded in favor of Defendants Allied and PPG.

### F. CONCLUSION

For all of reasons set forth thus far in this Opinion, the Court determines that judgment must be awarded to the Generator Defendants on NJTA' s CERCLA claims under § 107 and § 113 with respect to all seven sites at issue. Accordingly, the Count One is dismissed from this action in its entirety. Having dismissed the only fed-

eral claim in this action and there being no evidence of complete diversity among the parties, Accordingly, the Court may either decline to exercise jurisdiction over the remainder of NJTA's claims—all of which arise under state law—pursuant to 28 U.S.C. § 1367(c)(3) and dismiss them from this action without prejudice, or exercise its discretion to retain jurisdiction over these claims and address them on the merits. Because this case has already been pending in this Court for over five years and because NJTA's state law claims arise out of the same set of facts as did its CERCLA claim, the Court exercises its discretion to retain jurisdiction over the state law claims and addresses them on the merits.

## III. SPILL ACT LIABILITY

### A. *STATUTORY FRAMEWORK*

The Spill Act, N.J.S.A. 58:10–23.11 *et seq.*, is the New Jersey analog to CERCLA. It was adopted in 1976 to provide funds for a swift and sure response to environmental contamination. Like CERCLA, the Spill Act prohibits the discharge of hazardous substances and provides for the clean up and removal of such spills. *See* N.J.S.A. 58:10–23.11g; *S.C. Holdings*, 935 F.Supp. at 1365; *State, Dept. of Environmental Protection v. Ventron Corp.*, 94 N.J. 473, 494, 468 A.2d 150 (1983). Although drafted to remedy the same harms as CERCLA, the Spill Act is a separate and distinct statutory scheme requiring its own analysis. With respect to liability for cleanup and removal costs, the Spill Act provides that:

> Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.

N.J.S.A. § 58:10–23.11g(c)(1); *New Castle*, 111 F.3d at 1126. Unlike CERCLA, the Spill Act is clear that liability is strict and

joint and several in all cases without regard to fault. *New Castle*, 111 F.3d at 1126 (citing *Ventron*, 94 N.J. at 502, 468 A.2d 150).

### B. *APPLICATION*

■ NJTA relies upon the "is in any way responsible for any hazardous substance" language of the Spill Act to suggest that, because the Generator Defendants unquestionably produced COPR, each of them can be held liable. This argument, of course, completely ignores the need to show some nexus between the COPR that the Generator Defendants produced and the discharge of COPR occurring at each of the sites in question. While there is no doubt that the Spill Act has been liberally construed, certainly that construction has not been so liberal as to require the imposition of liability on the Generator Defendants merely because they were producers of COPR. It is precisely that logic that NJTA asks the Court to accept which, taken to the extreme, would render every manufacturer of COPR liable under the Spill Act for NJTA's seven sites regardless of whether they were connected in any way to those sites.

Allied attempts to bring NJTA's argument to the Court's attention but, in doing so, also misconstrues the statutory language on which NJTA improperly relies. When the Spill Act was first enacted, liability under 11g(c) (quoted above) depended on one's having "discharged"[13] a hazardous substance. *See Marsh v. N.J. Dept. of Envtl. Protection*, 152 N.J. 137, 145–46, 703 A.2d 927 (1997). Under that language, there was a strong argument that an owner of land onto which a hazardous substance had been deposited (such as NJTA in this case) who did not actively participate in the discharge was not liable for cleanup costs. *Id.* at 146, 703 A.2d 927. When it amended the Spill Act in 1979, the New Jersey Legislature expanded the scope of Spill Act liability. "No longer was liability limited to those who had actively discharged hazardous substances. Rather,

---

**13.** "Discharge" is defined under the Spill Act as ... any intentional or unintentional action or omission resulting in the release, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substance into the waters or onto the lands of the State, or into

waters outside the jurisdiction of the State when damage may result to the lands, waters or natural resources within the jurisdiction of the State ....

N.J.S.A. 58:10–23.11b(h).

one was strictly liable if one was 'in any way responsible for any hazardous substance which the [DEP] has removed or is removing pursuant to ... this act.' " *Id.* (citing legislative history).

At the center of the ensuing debate over the interpretation of the phrase "in any way responsible" was the question of whether an innocent landowner—on whose land hazardous substances were dumped prior to that owner's acquisition—could be held liable under the Spill Act. The New Jersey Supreme Court concluded that, although "[t]he subsequent acquisition of land on which hazardous substances have been dumped may be insufficient to hold the owner responsible," one who owned or controlled the property at the time of the pollution was a responsible party.[14] *Id.* (citing *Ventron,* 94 N.J. at 502, 468 A.2d 150). *Compare* CERCLA, 42 U.S.C. § 9607(a)(1) and (2) (including in its definition of PRP both the person who owned or operated the facility at the time of the disposal of a hazardous substance *and* the current owner or operator of a facility, regardless of when the disposal took place).

Ironically, the very language upon which NJTA relies to argue that the Generator Defendants are liable to it under the Spill Act is language which was meant to bring within the ambit of Spill Act liability parties such as NJTA itself who owned and controlled the sites in question when the disposal of COPR took place. Furthermore, as the foregoing discussion makes clear, NJTA's attempt to divorce the phrase "in any way responsible for any hazardous substance" from the rest of the statute must fail, as there is no support for its argument that one can be "responsible" for a hazardous substance without having a connection to the site on which that substance was deposited. In short, in order to proceed against the Generator Defendants on the theory that they are parties "in any way responsible for any hazardous substance," NJTA is charged with the burden of establishing some nexus between the COPR that each one allegedly produced and the COPR that was deposited at each of the sites in question. To hold otherwise would be to permit the imposition of Spill Act liability based solely upon the production of COPR.

Similarly, evidence that any of the Generator Defendants participated in the "trafficking" of COPR generally is not in itself enough to demonstrate a nexus between that Defendant and one or more of the sites in question. Evidence that each Defendant produced COPR, transported COPR, disposed of COPR and/or sold COPR is simply meaningless without evidence that each of these Defendants was responsible for COPR *at each of the sites* in question.

As the Court has already discussed above in connection with NJTA's CERCLA claims, NJTA has failed to come forward with competent evidence on which the trier of fact could conclude that each of the Generator Defendants was responsible for the discharge of COPR on any of the sites in question. Accordingly, judgment on NJTA's Spill Act claim is awarded in favor of the Generator Defendants, and Count Two of the complaint is dismissed in its entirety.

## IV. COMMON LAW CAUSES OF ACTION

In addition to its federal and state statutory claims, NJTA asserts six claims against the Generator Defendants under New Jersey common law. Defendant Allied moves for summary judgment on all six claims. As it did with respect to the other aspects of Allied's motion, Defendant PPG joins in Allied's motion on the common law claims. As well, Defendants Occidental and Maxus join wholeheartedly in Allied's motion on the common law claims although they do not submit a supplemental brief as they did with respect to the CERCLA claim. For the following reasons, the Court determines that the motion for summary judgment should be granted dismissing all six of NJTA's common law claims.

14. Following another Spill Act amendment in 1991, the DEP adopted a regulation, N.J.A.C. 7:1E–1.6, defining "person responsible for a discharge" to include, among others, "[e]ach owner or operator of any facility, vehicle or vessel from which a discharge has occurred."

A. *TRESPASS*

 In Count Four of its complaint, NJTA asserts a claim against the Generator Defendants for trespass. Apparently, NJTA seeks to hold the Generator Defendants liable under a trespass theory for the entry of the COPR onto NJTA's land. Trespass constitutes the unauthorized entry (usually of tangible matter) onto the property of another. *See Harvard Industries, Inc. v. Aetna Casualty & Surety Co.,* 273 N.J.Super. 467, 479, 642 A.2d 438 (Law Div.1993). Here, NJTA admits that, in constructing the New Jersey Turnpike, it contracted with various companies to purchase fill substance for use in various construction projects. It claims, however, that its acceptance upon its property of this fill substance—the COPR—was *not* the same thing as its acceptance of a toxic and dangerous substance—the same COPR, later found to be hazardous to the environment. Accordingly, it claims that the substance which was, in reality, "foisted upon it"—the same substance that it accepted, but whose "true nature" was unbeknownst to it—trespassed on its property.

Trespass has been held to be an inappropriate theory of liability in a case such as this. In *Kenney v. Scientific, Inc.,* 204 N.J.Super. 228, 256, 497 A.2d 1310 (Law Div.1985), for example, the court granted summary judgment on a trespass claim against a waste generator, reasoning that it was more appropriate to employ newly developed absolute liability theories than "to endeavor to torture old remedies to fit factual patterns not contemplated when those remedies were fashioned." *See also Jersey City Redevelopment Auth. v. PPG Industries,* 655 F.Supp. 1257 (D.N.J.1987) (relying on *Kenney* to dismiss plaintiff's trespass claim against a waste generator) and *Mayor and Council v. Klockner & Klockner,* 811 F.Supp. 1039, 1053 (D.N.J.1993) (recognizing that New Jersey courts have moved away from common law claims such as trespass and nuisance in environmental pollution cases).

 Even if a trespass claim were appropriate in an action such as this, NJTA's claim would fail as a matter of law. NJTA's subsequent discovery of the "true nature" of the fill substance it used to construct various parts of the Turnpike, does not transform its acceptance of fill into a trespass. For obvious reasons, NJTA does not appear to be alleging that the initial entry of the fill substance onto its property—for use in its own construction projects—constitutes trespass. Any claim that NJTA may be attempting to make in this respect, however, would necessarily fail for the same reasons that its CERCLA claims fails—there is no competent evidence before this Court which establishes that the COPR of the Generator Defendants was deposited at each of the NJTA sites in question. Finally, the Court notes that it declines NJTA's invitation to exercise its "discretion to permit the trespass claim to remain in the case pending evidence that will identify the actual trespasser" for the simple reason that, discovery having concluded, the Court does not have discretion to preserve a claim on which Defendants are entitled to judgment as a matter of law.

B. *PRIVATE NUISANCE*

 As noted, there is serious doubt as to whether NJTA's nuisance claim in Count Five has any place in this action. Even if it did, NJTA fails to establish the elements necessary to support a finding of liability. In order to establish a private nuisance, a plaintiff must demonstrate "an invasion of one's interest in the private use and enjoyment of land." *See Jersey City Redevelopment,* 655 F.Supp. at 1264–65. A claimant must show that there has been an "unreasonable, unwarranted or unlawful use by a person of his real property which is resulting in a material annoyance, inconvenience or hurt." *New Jersey Dept. of Envtl. Protection v. Exxon Corp.,* 151 N.J.Super. 464, 482–83, 376 A.2d 1339 (Ch.Div.1977). A cause of action for private nuisance, however, is confined to situations where one's property use interferes with another's use of *neighboring or adjoining* land. *Klockner,* 811 F.Supp. at 1057–58.

 NJTA has not demonstrated that either Allied or PPG engaged in an unreasonable or unwarranted use of land adjoining any of the sites in question here. Indeed, its opposition to Allied's motion is limited to an argument that Diamond Shamrock's refinery

was in effect contiguous with Site 56 and was within very close proximity to Sites 131 and 201. In any event, the Court determines that with respect to all seven sites and as against all three Generator Defendants, NJTA has failed to set forth any evidence that would support a private nuisance claim. There simply is no evidence that any of these Defendants engaged in an unwarranted, unreasonable or unlawful use of land. Accordingly, judgment on NJTA's private nuisance claim is awarded to the Generator Defendants, and Count Five is dismissed in its entirety.

## C. STRICT LIABILITY

In Count Three, NJTA alleges that the Generator Defendants' "generating, handling, storing, transportation and disposal" of "hazardous substances, pollutants and wastes" constituted abnormally dangerous activities for which they are strictly liable. (Compl.¶¶ 135–158). Any claim of strict liability for abnormally dangerous activities requires a plaintiff to demonstrate that the defendant engaged in an abnormally dangerous activity and harmed plaintiff as a result of that activity. *T & E Industries v. Safety Light Corp.*, 123 N.J. 371, 587 A.2d 1249 (1991) (citing *Restatement (Second) of Torts* § 519 (1977)). NJTA's strict liability claim suffers from the same impediment as do so many of the other claims in the complaint—a lack of evidence demonstrating a connection between the COPR produced by each Defendant and the COPR discovered at the seven sites in question. In other words, even assuming that each Generator Defendant engaged in the abnormally dangerous activity alleged here—chromium production and disposal—NJTA has not established that the harm it has allegedly suffered occurred as a result of each Defendant's engaging in that activity.

NJTA's reliance upon *Jersey City Redevelopment Auth. v. PPG Industries, Inc.*, 655 F.Supp. 1257 (D.N.J.1987), *aff'd*, 866 F.2d 1410 (3d Cir.1988), is misplaced. There, the plaintiff was able to establish with competent evidence that the defendant was responsible for depositing hazardous waste on the property at issue in that litigation. Thus, the court was not confronted with the same proof concerns at issue here. NJTA's assertions that the *Jersey City Redevelopment* decision is "powerful precedent for the Generators' joint and several liability as a matter of common law" and that, as a result of that action, Defendant PPG is collaterally estopped "from disputing its general role in the trafficking of chromate production waste" (NJTA's Br. in Suppt. of Cross–Motion at 43) are unpersuasive. Neither contention addresses the real issue here, which is NJTA's obligation to produce competent evidence linking the activities of these Defendants to the harm that NJTA has allegedly suffered. Unlike the New Jersey Redevelopment Authority, NJTA has failed to sustain its burden of proving this link.[15] Accordingly, its strict liability claim against the Generator Defendants in Count Three must be dismissed as a matter of law.

## D. NEGLIGENCE

NJTA claims in Count Six that the Generator Defendants "negligently caused and/or permitted hazardous substances to be generated, stored, treated, disposed of and otherwise managed so as to cause, permit or allow the release or threatened release of hazardous substances onto the NJTA Sites," and breached its alleged duty "to warn members of the general public, including NJTA, of the potential hazards or risks ... presented ... by the residue mud." (Compl.¶¶ 167–171). It is well settled that, for a defendant to be liable in negligence, it must have breached a duty of care it owed to the plaintiff, which breach must have been both the factual and legal cause of plaintiff's injuries. *See Weinberg v. Dinger*, 106 N.J. 469, 484, 524 A.2d 366 (1987). NJTA has failed to establish any of these elements of a valid claim for negligence.

In an argument which purports not only to defeat Defendants' motions for summary judgment on its negligence claim but, as well,

---

**15.** Contrary to NJTA's contentions regarding evidence obtained against PPG in the *Jersey City Redevelopment* case, evidence that its COPR "may have gone to the Turnpike" does not tie PPG's COPR to any of the seven sites in question in this litigation.

to warrant an award of judgment in its favor, NJTA states that the Generator Defendants "breached a duty of care that they owed to the Authority in common with all other property developers in the Hudson–Essex area who they knew were using or were likely to use the hazardous [COPR] substance as fill." (NJTA Br. in Suppt. of Cross–Motion at 43). NJTA offers no competent proof that any of the Generator Defendants did, in fact, know that NJTA was using or was likely to use COPR in its construction projects, let alone COPR that had been produced at that Defendant's facilities. Unable to establish that any of the Generator Defendants had any connection with it so as to owe it this alleged duty, NJTA instead relies upon terminology reminiscent of an action for strict products liability to bolster its claim. It accuses the Generator Defendants of "individually plac[ing] the hazardous substance in commerce with full knowledge of its dangers." (*Id.*). It offers no factual support for its claim, and certainly cannot point to a single case to support its theory of the law.

Also fatal to this claim is its argument that a plaintiff does not bear the burden of proof on all of the elements of a claim for negligence: "Proximate cause in this scenario is established or establishable ... by the facts and legal doctrine discussed in Point II(D) above." (*Id.*). Its reference, of course, is to its attempt to invoke the doctrine of alternative liability in order to shift the burden of proof on the causation element to Defendants. As previously discussed, that doctrine does not apply in this case and, even if it did, it would not excuse NJTA from first having to show that Defendants acted negligently by breaching a duty of care owed to it. There being no evidence that any actions attributable to the Defendants constituted a breach of a duty owed to NJTA or that any of their actions resulted in any damage to NJTA, its claim for negligence in Count Six is dismissed as a matter of law.

### E. *IMPLIED WARRANTY*

In Count Seven of its complaint, NJTA asserts a claim for breach of implied warranty of fitness for a particular purpose. In this regard, NJTA claims that the Generator Defendants knew of NJTA's "special needs ... for fill material to be used in the construction of the New Jersey Turnpike," and that they "impliedly warranted that the fill material which they generated, transported and delivered would be reasonably fit for ... [NJTA's] special needs" when, in fact, it was not. (Compl.¶¶ 172–175). This claim, like NJTA's trespass and private nuisance claims, has no place in the present case. As the court recognized in *Kenney*, concepts of implied or express warranty simply cannot be applied to hazardous waste cases. 204 N.J.Super. at 256, 497 A.2d 1310 (granting summary judgment in favor of generators on breach of warranty claims).

Moreover, NJTA cannot prevail on its implied warranty claim as a matter of law, because it has not demonstrated proof of any of the elements of such a claim. Indeed, there is no evidence in this case even to make the threshold showing that NJTA contracted with any of the Generator Defendants to obtain COPR from any of their facilities. Further, there is no evidence that any of the Generator Defendants knew of NJTA's alleged "special needs," that NJTA relied on them to furnish material suited to those needs or that any of them knew that NJTA was so relying. *See Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 370, 161 A.2d 69 (1960) (setting forth the elements of a claim for breach of implied warranty of fitness for a particular purpose). Apparently, NJTA concedes the futility of its implied warranty claim in Count Seven, as it chose not to respond to any of Defendants' arguments in its moving brief as to why this claim should be allowed to proceed. For all of these reasons, the Court awards judgment on NJTA's implied warranty claim to the Generator Defendants and dismisses this claim as a matter of law.

### F. *UNJUST ENRICHMENT*

Finally, in Count Eight, NJTA asserts a claim against the Generator Defendants for unjust enrichment, arguing that they were unjustly enriched at NJTA's expense because, "[b]y providing the chromium containing residue mud to [NJTA], ... instead of properly disposing of same," the

Generator Defendants "avoided the true costs of disposal." (Compl.¶ 178). A plaintiff claiming unjust enrichment bears the burden of proving that the defendant received a benefit from it and that retention of that benefit without payment would be unjust. *See VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554, 641 A.2d 519 (1994). NJTA has presented absolutely no evidence to indicate that any of the Generator Defendants received any benefit from NJTA because, as repeated numerous times in this Opinion, there is no competent evidence to link the COPR produced and allegedly sold by the Generator Defendants to the COPR that NJTA purchased and used for construction projects on the various sites in question. In fact, NJTA has not advanced any specific arguments in response to the Defendants' motion for summary judgment on its unjust enrichment claim. Accordingly, judgment on this claim is awarded in favor of the Generator Defendants, and Count Eight is dismissed as a matter of law.

## V. NJTA'S CROSS–MOTION

Judgment on all of NJTA's claims against the Generator Defendants having been awarded in their favor, NJTA's cross-motion for judgment on liability is perforce denied.

### CONCLUSION

For the reasons discussed herein, the Court determines that all of NJTA's claims under CERCLA, the Spill Act and New Jersey common law against the Generator Defendants fail as a matter of law, and it awards judgment on these claims in their favor. The Court determines, as well, that Defendant Occidental's cross-claim fails as a matter of law and, therefore, judgment on that claim is awarded in favor of Allied and PPG. Accordingly, the Generator Defendants' motions for summary judgment are granted in their entirety, and Plaintiff's cross motion for summary judgment on liability is, therefore, denied.

### ORDER

For the reason set forth in the Court's Opinion filed herewith,

It is on this 15th day of May, 1998, **ORDERED** that:

(1). The motions of defendants AlliedSignal, Inc., PPG Industries, Inc., Occidental Chemical Corporation and Maxus Energy Corporation for summary judgment be and the same hereby are granted; and

(2). Plaintiff's cross-motion for summary judgment on liability be and the same hereby is denied.