**LENOX INCORPORATED, Atlantic City Electric Company, & American Cyanamid Company, Plaintiffs,**

v.

**REUBEN SMITH RUBBISH REMOVAL, et al., Defendants.**

**Civil Action No. 97–5065 (JEI).**

United States District Court, D. New Jersey.

April 4, 2000.

The Court has researched Michigan state law and concludes that the outcome is the same under the law of both states.

Sills Cummis Radin Tischman Epstein & Gross by James E. Brandt, Newark, NJ, for plaintiffs Lenox Inc., Atlantic City Elec. Co., and American Cyanamid Co.

Methfessel & Werbel by Fredric Paul Gallin, Edison, NJ, for defendant Douglas Keefe.

**OPINION**

IRENAS, District Judge.

This matter appears before the Court upon defendant Douglas Keefe's motion for summary judgment. For the reasons set forth below, this motion is granted in part and denied in part.

**I.**

This action revolves around the environmental contamination of the Delilah Landfill Superfund Site in Egg Harbor Township, New Jersey ("the Site"). Plaintiffs in this action seek contribution for the costs of the ongoing remediation of the Site. Defendant is the Site's current owner.

Defendant purchased the Delilah Landfill in January of 1981. In 1982, the United States Environmental Protection Agency ("EPA") conducted a preliminary assessment of the Landfill which indicated that it may have impacted groundwater quality in the surrounding areas. (Second Am. Compl., ¶ 98). On October 4, 1984, the Site was listed on the National Priorities List. (*Id.* at ¶ 99). Subsequently, the EPA authorized the New Jersey Department of Environmental Protection ("NJDEP") to assume control of the Site's remediation. (*Id.*)

In 1985, the NJDEP conducted an investigation of the Site and discovered a host of hazardous substances present in the soil and groundwater.[1] (*Id.* at ¶ 101). Based upon these findings, the NJDEP issued a Record of Decision ("ROD") which proposed a remedy for the Site including, *inter alia,* installation of a landfill cap. (*Id.* at ¶ 102). On or about November 7, 1992, the NJDEP issued a Directive to remedy the site to several parties including the present plaintiffs. (*Id.* at ¶ 103). In or around October of 1994, the NJDEP entered an Administrative Consent Order ("ACO") in which the present plaintiffs agreed to create a "soil cap" at the site. (*Id.* at ¶ 107). Plaintiffs currently estimate

1. The term "hazardous substance" is defined by CERCLA at Section 101(14), 42 U.S.C. § 9601(14), and by the New Jersey Spill Act at N.J.S.A. 58:10–23.11b.

that the total cost of the investigation and remediation of the Site will be $6,979,846.[2] (*Id.* at ¶ 110).

In their Amended Complaint, plaintiffs seek contribution from Keefe under § 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9613(f), and under the New Jersey Spill Act, N.J.S.A. 58:10–23.11g.c.(1). Plaintiffs also seek treble damages under the Spill Act, § 58:10–23.11f.a.(3), and assert common law claims for unjust enrichment and the creation of a constructive trust. Keefe moves for summary judgment as to all claims. Keefe argues, on equitable grounds, that because he did not own the Site at the time the majority of the hazardous substances were deposited, he should not be held liable for its cleanup. Furthermore, he argues that he has a good faith defense to plaintiffs' claim for treble damages and that plaintiffs' claim for $1.5 million in past oversight costs should be dismissed as speculative. Keefe also argues that this is not an appropriate case for the creation of a constructive trust because he was not unjustly enriched by plaintiffs' remediation of the Site. The Court will consider each issue in turn.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III.

Under CERCLA, a private party who has incurred "response costs" for environmental cleanup may seek contribution from any person who is liable or potentially liable for depositing the hazardous wastes. 42 U.S.C. § 9613(f). In order to recover under § 9613(f), plaintiff must first show that defendant is liable under CERCLA § 107(a), 42 U.S.C. § 9607(a). If plaintiff succeeds in establishing defendant's liability under § 107(a), the Court then may apportion defendant's share of liability in an equitable manner. *U.S. v. Compaction Sys. Corp.,* 88 F.Supp.2d 339, 354 (D.N.J. 2000).

■ To establish defendant's liability under § 107(a), plaintiff must show: (1) that the site in question is a "facility" as defined by CERCLA; (2) the defendant is a "responsible person" as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release has required the plaintiffs to incur response costs. *New Jersey Turnpike Auth. v. PPG Indus. Inc.,* 16 F.Supp.2d 460, 467 (D.N.J.1998).

In the present motion, Keefe does not dispute that plaintiffs have established each of the elements of their prima facie case under § 107(a).[3] Nor does Keefe as-

---

**2.** According to plaintiffs, this figure includes $521,346 previously spent on groundwater investigation, $4,508,500 for the soil cap and associated costs, $1.5 million for past EPA and NJDEP oversight costs, and an estimated

$450,000 in future NJDEP oversight costs. (Second Am. Compl., ¶ 110).

**3.** The facts of this case and the relevant case law indicate that Keefe is most likely liable

sert one of the defenses to liability potentially available under 42 U.S.C. § 9607(b). Rather, Keefe asks this Court to enter summary judgment on his behalf because, even if he were found liable under § 107(a), as a matter of equity he should not be made to bear any of plaintiffs' response costs.

■ 42 U.S.C. § 9613(f)(1) provides that in allocating contribution costs among liable parties, the Court may consider "such equitable factors as the court determines are appropriate." Although CERCLA itself provides no precise list of equitable factors for the Court's consideration, several courts have looked to the so-called "Gore factors" for guidance. *American Cyanamid Co. v. Nascolite Corp.*, No. Civ.A. 92–CV–3394, 1995 WL 934871, at *6–7 (D.N.J. March 31, 1995). The "Gore factors" were proposed as an amendment to CERCLA in 1980 by then Congressman Al Gore. Although the amendment was not passed, New Jersey courts have used the Gore factors to aid in the equitable allocation of contribution costs. (*Id.*). The Gore factors include:

1. the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

2. the amount of the hazardous waste involved;

3. the degree of toxicity of the hazardous waste involved;

4. the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

5. the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

6. the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

(*Id.*)

In the instant motion, Keefe argues that "as a matter of law, under the facts and circumstances of this case, [his] equitable share [of the response costs] should be zero." (Def.'s reply, 7). Keefe argues that plaintiffs have not produced any evidence that hazardous substances were deposited on the property after he bought it, that the condition of the property deteriorated during the time he owned it, or that plaintiffs' remediation costs have increased as a result of his actions. (*Id.* at 9). In support of these assertions, Keefe cites to the deposition testimony of David R. Perry, an environmental consultant who was retained by plaintiff Lenox, Inc. to investigate possible remedies at the Site. (Pl.'s Ex. C, dep. of D. Perry, 26:17–20, 35:1–10). At his November 6, 1998 deposition, Mr. Perry gave the following testimony:

Q: Is there anything based upon the investigation and materials you reviewed that indicated that site conditions had gotten any worse from the time the landfill stopped accepting waste in 1980?

A: No.

Q: Was there anything in which you reviewed would indicate anything which occurred in that nine years was going to make the remedy more expensive?

. . . .

A: No.

(*Id.* at 96:10–97:1). In light of Mr. Perry's deposition testimony, Keefe argues that it would be inequitable for the Court to require him to pay a portion of the response costs: "[p]ut another way the plaintiffs are asking Mr. Keefe to pay money to clean-up their own mess." (Def.'s brief, 5).

under § 107(a). Indeed, on page 8 of his reply brief, plaintiff concedes that he is "technically a potentially responsible party" and on page 5 of his original brief, plaintiff admits that he "would not qualify as a truly innocent

landowner." However, because no motions to impose liability are pending, the issue of Keefe's liability under CERCLA and the Spill Act will not be decided here and will be preserved for trial.

Plaintiffs offer several arguments in response to Keefe's characterization of their claims. First, plaintiffs argue that Keefe has misrepresented Mr. Perry's testimony. Plaintiffs point out that Mr. Perry was asked whether he found any evidence that the Site had worsened during the relevant period based upon his review of three specific documents (two 1989 environmental reports prepared by another consulting firm and an August 18, 1989 transcript of a public meeting). (Pls.'s brief in opp., 4–5, n. 6). According to plaintiffs, Mr. Perry was not offering an opinion as to whether or not conditions had deteriorated during that time, only whether those three documents indicated that conditions had deteriorated. (*Id.*). In addition, plaintiffs have attached a recent affidavit from Mr. Perry in which he states that it was beyond the scope of his investigation to determine whether or not conditions at the Site had actually gotten worse. (Aff. of D. Perry, ¶ 5).

Plaintiffs also contend that, contrary to Keefe's assertions, hazardous wastes were deposited at the Site while Keefe was the owner. In a deposition taken on December 14, 1999, Keefe indicated that quantities of a chemical waste known as "fly ash" were dumped at the Site in 1982, after he acquired ownership. (Pls.'s Ex. B, 83:13–20).[4] In response, Keefe argues that he should not be held liable for this contamination because the "fly ash" was dumped by Atlantic Electric, one of the plaintiffs in this matter, without his knowledge or consent. (Def.'s reply, 6).

Plaintiffs also argue that Keefe should pay a percentage of the response costs because he was aware of the environmental danger posed by the Site at the time he purchased it, yet he took no steps to remedy that danger. Plaintiffs point to several portions of Keefe's deposition testimony and note that: (1) Keefe was aware that the former owner of the Site had operated it as a sanitary landfill (Def.'s Ex. C); (2) he was aware that the former owner had also operated a landfill known as "Price's Pit" which Keefe described as a "well-known, infamous hazardous waste disposal site" (Pls.' Ex. B, 69:20–23); (3) he knew that the Site had not been properly closed pursuant to state law and that it might cost "a million dollars to properly close" the Site (*Id.* at 77:1–10, 75:14–22); (4) despite this knowledge, he did not fence in the landfill or take any other steps to prevent further dumping (*Id.* at 81:20–82:18, 84:19–86:7); (5) he refused to comply with the 1991 NJDEP Directive that ordered him to remove hazardous substances from the Site (*Id.* at 136:21–137:6); (6) he failed to enter in the Administrative Consent Order with the NJDEP (*Id.* at 142:23–25); and (7) as a result of his failure to act to remediate the Site, the NJDEP authorized plaintiffs to seek treble damages against Keefe under the New Jersey Spill Act. (Pls.' Ex. F).

 Finally, plaintiffs argue that the equitable apportionment of response costs is not an issue the Court can properly consider on a motion for summary judgment. *See* Pls.' brief, 5 ("Summary judgment is simply not the forum in which to determine a party's equitable allocation or to address objections to a particular component of a plaintiff's damages.") While the Court sees no statutory bar to addressing the allocation of response costs on a motion for summary judgment, the Court finds that summary judgment is not appropriate at this time. First, it would be difficult to designate each party's equitable share of the costs before each party's liability was conclusively established. *See Grand Street Artists v. Gen. Elec. Co.*, 28 F.Supp.2d 291, 295 (D.N.J.1998)(holding that "[o]nce liability is established," each party's share of the response costs is apportioned according to those equitable factors the court deems appropriate) (citation

---

4. Later in the same deposition, Keefe references documents which indicate that 6,000 cubic yards of "dry chemical waste" (fly ash) were deposited at the Site at this time. (Pls.'s Ex. B, 135:2–10).

omitted); *see also Town of New Windsor v. Tesa Tuck, Inc.,* 919 F.Supp. 662, 674 (S.D.N.Y.1996)("[T]his sort of allocation of costs, relating to the equitable determination of the amount of damages attributable to each defendant, is more appropriately addressed when liability has been established...."). Second, there are genuine issues of material fact as to defendant's alleged failure to prevent further dumping at the Site and his lack of involvement in the remediation of the Site. *See Farmland Indus., Inc. v. Colorado & Eastern R.R. Co., Inc.,* 922 F.Supp. 437, 442 (D.Colo.1996)("Because allocation of cleanup costs can be based on many equitable factors on which there may be much competing evidence leading to material issues of fact, the issue of contribution may not always be suited to disposition by summary judgment.")(citing *Environmental Transp. Sys. Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509–510 (7th Cir.1992)). Accordingly, Keefe's motion for summary judgment as to plaintiffs' claims for contribution under CERCLA § 113(f), 42 U.S.C. § 9613(f), is denied.

**IV.**

Keefe also moves for summary judgment as to plaintiffs' claims for contribution under the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A., N.J.S.A. 58:10–23.11 *et seq.* The Spill Act is the "New Jersey analog to CERCLA." *New Jersey Turnpike Auth.,* 16 F.Supp.2d at 476. "Like CERCLA, the Spill Act prohibits the discharge of hazardous substances and provides for the clean up and removal of such spills." *Id.* The Act provides that:

Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred.

N.J.S.A. 58:10–23.11g.c.(1). The Act further provides that:

Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

N.J.S.A. 58:10–23.11f.a.(2). The regulations which implement the Act define persons "in any way responsible" to include, among others, owners of facilities from which a discharge has occurred. N.J.A.C. 7:1E–1.6.

■ In resolving contribution claims under the Spill Act, a court may allocate the costs of cleanup among liable parties using such equitable factors as the court determines to be appropriate. N.J.S.A. 58:10–23.11f.a.(2). Here, Keefe asks this Court to "exercise discretion in determining whether to really impose Spill Act responsibilities" upon him. (Def.'s reply, 8). Essentially, Keefe repeats his arguments regarding contribution under CERCLA. He asks this Court to decide, as a matter of law, that even if he were "technically" liable for the costs of remediating the Site, he should not be assigned an equitable share of those costs. (*Id.*). Largely for the reasons set forth in Section III above, the Court will deny Keefe's motion for summary judgment with respect to this claim. Because Keefe's liability has not yet been established and because genuine issues of fact remain as to his alleged failure to prevent further dumping at the Site and to participate in the Site's remediation, Keefe's motion is premature.

**V.**

In Count III of their Amended Complaint, plaintiffs' assert a claim against Keefe for treble damages pursuant to section 58:10–23.11f.a.(3) of the Spill Act. That section provides that the NJDEP may, in

its discretion, authorize any persons who have entered into agreement with the NJDEP to cleanup a contaminated site and who seek contribution for the costs of that cleanup, to "collect treble damages from any contribution defendant who has failed or refused to comply with any directive." By letter dated December 27, 1994, the NJDEP authorized plaintiffs to seek treble damages from Keefe because he neither complied with the NJDEP's November 7, 1991 Directive nor entered into the Administrative Consent Order (ACO) with the NJDEP.[5] (Pls.' Ex. F).

Defendant argues that, even if his motion for summary judgment as to plaintiffs' Spill Act contribution claims is denied, plaintiffs' claim for treble damages should be dismissed because he has a "good faith" defense to such claims. N.J.S.A. 58:10–23.11f.a.(3) provides that a contribution defendant may avoid treble damages where he had "good cause" for failing to enter the settlement agreement with the NJDEP or where principles of "fundamental fairness" would be violated. In *In re Kimber Petroleum*, 110 N.J. 69, 539 A.2d 1181, 1188 (1988), the New Jersey Supreme Court held that a defendant could show "good cause" where the defendant had "an objectively reasonable basis for believing that [the NJDEP's] directive was either invalid or inapplicable to it."

In this case, Keefe states that he did not believe that the Directive applied to him because "[f]rom [his] perspective [sic] the pollution was caused by [the former owner of the Site] and not by him." (Def.'s brief, 13). Keefe also states that he "does not have the resources of major companies like [plaintiffs]" and he "objectively felt that cleaning up this waste was the responsibility of the polluters—not himself." (*Id.*)

In response, plaintiffs argue that, by definition, Keefe's "feelings" are subjective, not objective. They also note that Keefe did not challenge the NJDEP's directive at the time it was issued. In addition, plaintiffs have attached an excerpt from a December 14, 1999 deposition at which Keefe testified that he did "nothing" in response to the Directive. (Pls.'s Ex. B, 136:21–137:6). Plaintiffs also cite to Keefe's testimony that he did not sign the Administrative Consent Order because he found it "ludicrous to hold a person responsible for actions of another who has had no direct involvement in the problem." (*Id.* at 142:23–25).

■ The Court finds plaintiffs' arguments persuasive. Based on the record currently before this Court, it appears that Keefe did not abide by the NJDEP directive or sign the ACO because he felt that it was "unfair" for him to pay for the cleanup because he did not, himself, deposit any hazardous waste on the land. Because Keefe has not proffered sufficient evidence from which the Court can conclude that this belief was "objectively" reasonable, the Court will not dismiss plaintiffs' claims for treble damages at this time.

## VI.

In paragraph 110 of their Amended Complaint, plaintiffs estimate the total cost of the Site's remediation at $6,979,846. Plaintiffs include in this amount $1.5 million for past EPA and NJDEP oversight costs and $450,000 in future NJDEP oversight costs.

As part of his motion for summary judgment, Keefe asks the Court to "strike" plaintiffs' claims for the $1.5 million in past oversight costs. Keefe claims that plaintiffs have settled the NJDEP's claims for all past oversight costs for $60,000 and that the EPA has never demanded payment for any past oversight costs. (Def.'s brief, 10). Keefe argues that the EPA has not been involved in the Site's remediation for over ten years and "it is highly unlikely

---

5. In 1998, the Spill Act was amended to eliminate the requirement that contribution plaintiffs obtain authorization from the NJDEP pri-

or to filing claims for treble damages. N.J.S.A. 58:10–23.11f.a.(3).

that they are suddenly going to come out of the woodwork and start demanding money to cover costs they expended over ten years ago." (*Id.*)

Plaintiffs argue that past oversight costs are recoverable in a contribution action, that the EPA incurred such costs and that plaintiffs remain liable for such costs. (Pls.'s brief, 14). In addition, they argue that Keefe has offered no evidence that the EPA has forgiven or will forgive these oversight costs.

■ To the extent that Keefe seeks to dismiss plaintiffs' claims for the EPA's past oversight costs under CERCLA, his motion is granted. The Third Circuit has held that the government may not recover from private parties the cost of government oversight of the remedial activity performed by a private party. *U.S. v. Rohm and Haas Co.*, 2 F.3d 1265, 1278 (3d Cir.1993). In *Rohm,* the Third Circuit found that the government's oversight "is intended to protect the public interest rather than the interests of those being overseen." *Id.* at 1273. Therefore, the Court refused to presume that "Congress [ ] intended a statute to create the dramatic and unusual effect of requiring regulated parties to pay a large share of the administrative costs incurred by the overseeing agency unless the statutory language clearly and explicitly requires that result." *Id.* at 1273–74. The Court concluded: "We think it ... likely that Congress viewed EPA's overseeing of a private party's removal activities as qualitatively different from EPA's actually performing removal activities and intended for EPA to recover the costs of the latter but not the costs of the former." *Id.* at 1277. Based on the Court's holding in

*Rohm,* the EPA cannot recover past oversight costs from plaintiffs and, *ipso facto,* plaintiffs cannot seek contribution for these costs from Keefe.

■ To the extent that Keefe seeks to dismiss plaintiffs' claims for the NJDEP's past oversight costs under the Spill Act, his motion is denied. Contrary to the Third Circuit's opinion with respect to CERCLA, the New Jersey Superior Court, Appellate Division, has held that past oversight costs expended by the NJDEP are recoverable under the Spill Act.[6] *E.I. du Pont de Nemours and Co. v. Dep. of Env. Protection and Energy,* 283 N.J.Super. 331, 661 A.2d 1314 (App.Div. 1995). In *duPont,* the Appellate Division held that under N.J.S.A. 58:10–23.11g.c.(1), the NJDEP had the "implied" power to "collect its oversight costs from those entering into agreements or orders with [NJDEP] to remediate." *Id.* at 1320. Because the NJDEP may recover past oversight costs from plaintiffs, these costs are a proper element of plaintiffs' contribution claim against defendant Keefe. *See* N.J.S.A. 58:10–23.11f.a.(2). Assuming that defendant is held liable for contribution for the costs of cleanup and removal, the precise amount of the NJDEP oversight costs will be an issue for the trier of fact.

## VII.

In Counts IV and V of their Amended Complaint, plaintiffs assert claims based on New Jersey common law. In Count IV, plaintiffs seek the creation of a constructive trust. In Count V, plaintiffs assert a claim based on Keefe's alleged unjust enrichment.

---

**6.** The Court has searched, but has uncovered no New Jersey Supreme Court case on-point. In the absence of relevant New Jersey Supreme Court precedent, the Court will accept the decision of the Appellate Division as "presumptive evidence of state law." *Commercial Union Ins. v. Bituminous Casualty Corp.*, 851 F.2d 98, 100 (3d Cir.1988); *see also West v. AT & T*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.").

■ Under New Jersey law, a constructive trust may arise even though the acquisition of the property was not wrongful "where the retention of the property would result in the unjust enrichment of the person retaining it." *D'Ippolito v. Castoro*, 51 N.J. 584, 242 A.2d 617, 619 (1968). "Unjust enrichment" occurs where "an individual retains money or benefits which in justice and equity belong to another." *First Interregional Advisors Corp.*, 218 B.R. 722, 730 (Bankr.D.N.J.1997)(quoting Black's Law Dictionary 1535 (6th ed.1990)).

Plaintiffs claim that Keefe has been unjustly enriched in two ways. First, plaintiffs claim that under the Sanitary Landfill Closure and Contingency Fund Act, N.J.S.A. 13:1E–100, *et seq.*, Keefe had an obligation to close the landfill that was operated at the Site. The Act provides that:

> Every owner or operator of a sanitary landfill shall be jointly and severally liable for the proper operation and closure of the facility, as required by law, and for any damages, no matter by whom sustained, proximately resulting from the operations or closure.

N.J.S.A. 13:1E–103. Plaintiffs argue that, in connection with the remediation of the Site, they have performed Keefe's obligation to close the landfill and have incurred substantial costs in doing so. They contend that Keefe has been unjustly enriched to the extent of these costs.

Second, plaintiffs claim that Keefe has been unjustly enriched because the value of the Site has been substantially increased by plaintiffs' ongoing cleanup efforts. Keefe paid $75,000.00 for the 48 acre property in 1981. (Second Am. Compl., ¶ 156). Plaintiffs have attached an appraisal of the property, dated October 1, 1999, which estimates its current value at $1,150,000.00. (Pls.' Ex. A). Plaintiffs argue that this substantial increase in value is attributable to their cleanup of the Site and that it would be inequitable for plaintiff to retain the benefit of their efforts.

As a result of this alleged unjust enrichment, plaintiffs ask the Court to impose a constructive trust upon Keefe's "right, title and interest" in the property. (Second Am. Compl., ¶ 159).

■ The Court will dismiss plaintiffs' claims in Count IV and V. Although neither party has addressed the issue, the Third Circuit has held that state common law claims surrounding the remediation of a contaminated state are preempted by CERCLA. In *In re Reading Company*, 115 F.3d 1111 (3d Cir.1997), a reorganized debtor and former railroad company sought to enjoin plaintiffs from seeking contribution from it for environmental cleanup liability. Although plaintiffs had brought suit under CERCLA, they also asserted claims under New Jersey common law for contribution and restitution. The district court held that plaintiffs' common law claims were preempted by CERCLA. The Third Circuit affirmed.

The Third Circuit held that CERCLA did not explicitly preempt state common law claims. *Id.* at 1117. Nor did it create a comprehensive scheme of regulation that left no room for state law supplementation. *Id.* However, the Court found that there was an "actual conflict" between CERCLA's settlement scheme and plaintiffs' common law claims for contribution and restitution. *Id.* The Court held:

> [W]hen Congress expressly created a statutory right of contribution in CERCLA § 113(f), 42 U.S.C. § 9613(f), it made that remedy part of an elaborate scheme aimed at the efficient resolution of environmental disputes. Permitting independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress. We conclude therefore that Conrail's common law claims are preempted by CERCLA § 113(f).

*Id.*

In *Continental Title Co. v. Peoples Gas Light and Coke Co.*, No. 96 C 3257, 1999

WL 1250666 (N.D.Ill. March 18, 1999), plaintiff, the current owner of a contaminated site, brought a CERCLA action against defendant, the former owner of the site, for contribution costs under § 9613(f). Defendant asserted a state law counterclaim for unjust enrichment. The Court summarized defendant's claim as follows: "Defendant's theory is that Plaintiff purchased the Site at a substantial discount, now seeks to convert the contaminated property into a glorious residential complex at Defendant's expense, and that Plaintiff will be unjustly enriched by its retention of that benefit." *Id.* at *14. The Court, citing *In re Reading Co.,* concluded that defendant's claim for unjust enrichment was preempted by CERCLA. *Id.*

The facts in *Continental* are similar to the facts presented here and the Court agrees with the conclusion of that Court.` Permitting the present state law claims to proceed would circumvent the statutorily created settlement scheme set forth in CERCLA, 42 U.S.C. § 9613(f). Thus, the Court finds that plaintiff's state law claims for unjust enrichment and the creation of a constructive trust are preempted by CERCLA.

Even if plaintiffs' claims were not preempted by CERCLA, they would be dismissed. Prior to the Third Circuit's opinion in *Reading,* several courts held that unjust enrichment claims should be dismissed in CERCLA cases where, as here, plaintiffs' have an independent duty to cleanup the contaminated site. For example, in *Ciba–Geigy Corp. v. Sandoz Ltd.,* Civ. A. No. 92–4491, 1993 WL 668325 (D.N.J. June 17, 1993), plaintiff landowner brought a common law claim for restitution from the prior owner of the Site for the costs it had incurred in cleaning up the Site. The Court held that plaintiff was foreclosed from recovering on this common law claim because it had an independent duty to cleanup the Site. The Court adopted the reasoning of the district court

for the Middle District of Pennsylvania in *Smith Land & Improvement Corp. v. Rapid American Corp.,* 18 Envtl. L. Rep. 20769, 1987 WL 56461 (M.D.Pa.1987), vacated on other grounds, *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988). In that case, the Pennsylvania district court held:

> Just because the EPA chose the plaintiff to do the cleanup work does not mean that the defendant was enriched. The plaintiff continually argues that the defendant was spared the cleanup costs. Yet the plaintiff fails to realize that it was equally responsible to clean its land.

*Id.* at 20771, 1987 WL 56461.

▆ In this case, plaintiffs had an independent duty, pursuant to the NJDEP Administrative Consent Order, to cleanup the Site. Therefore, even if it were not preempted, plaintiffs' claim for unjust enrichment would be dismissed.[7] *See e.g., SC Holdings, Inc. v. A.A.A. Realty Co.,* 935 F.Supp. 1354, 1372 (D.N.J.1996) (holding that "in view of plaintiff's independent obligation to perform remediation activities at the [ ] Site, its claim for unjust enrichment must be dismissed as a matter of law."); *Mayor and Council v. Klockner & Klockner,* 811 F.Supp. 1039, 1058–59 (D.N.J.1993)(same); *Cooper Indus., Inc. v. Agway, Inc.,* 987 F.Supp. 92, 104 (N.D.N.Y.1997)(same).

## VIII.

For the reasons set forth above, Keefe's motion is granted in part and denied in part. Keefe's motion for summary judgment as to plaintiffs' claims under CERCLA and the Spill Act and for treble damages under the Spill Act is denied. Keefe's motion as to plaintiffs' claim for $1.5 million in past oversight costs is granted to the extent that plaintiffs seek to recover past EPA oversight costs under CERCLA. Finally, Keefe's motion is granted with respect to Counts IV and V

---

7. Because plaintiffs' claim for the creation of a constructive trust is dependent on the claim for unjust enrichment, this claim would also be dismissed.

of plaintiffs' Amended Complaint. The Court will issue an appropriate order.